# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| BILTRITE FURNITURE, INC. individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br><br>Defendant. | Civil Action No. 20-cv-656<br><br>**CLASS ACTION COMPLAINT** and<br>**<u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Biltrite Furniture, Inc. ("Biltrite" or "Plaintiff"), individually and on behalf of the other members of the below-defined classes (collectively, the "Class"), brings this class action against Defendant Liberty Mutual Insurance Company ("Liberty" or "Defendant"), and alleges the following:

## <u>INTRODUCTION</u>

1.     Plaintiff brings this action on behalf of a proposed class of policyholders who paid premiums in exchange for an all-risk commercial property insurance policy that included lost business income and extra expense coverage.

2.     On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a worldwide pandemic: "WHO has been assessing this outbreak around the clock and we are deeply concerned both by the alarming levels of spread

and severity, and by the alarming levels of inaction. We have therefore made the assessment that COVID-19 can be characterized as a pandemic."[1]

3.      On March 16, 2020, the Centers for Disease Control and Prevention and members of the national Coronavirus Task Force issued to the American public guidance, styled as "30 Days to Slow the Spread" for stopping the spread of COVID-19. This guidance advised individuals to adopt far-reaching social distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, gyms and food courts.[2]

4.      Following this advice, many state governments, including Wisconsin, took measures in the form of Emergency Orders to protect the health and safety of their residents from the human-to-human and surface-to-human spread of COVID-19.

5.      As a result, many governmental entities, including Wisconsin, entered civil authority orders suspending or severely limiting business operations of "non-essential businesses" that interact with the public and provide gathering places for the individuals.

---

[1]      *See* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-COVID-19 11-march-2020

[2]      https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20coronavirus-guidance 8.5x11 315PM.pdf

6. Over 40 states within the United States issued some type of "stay-at-home" Emergency Order closing private non-essential business operations.

7. The result of these closures has been catastrophic for most of these non-essential businesses, especially retail establishments that were forced to close, furlough employees, and endure a sudden shutdown of cash flow that threatens their survival.

8. Many businesses pay significant premiums to insure against such catastrophic events like the government-issued orders mandating suspension of business activities through all-risk commercial property insurance policies.

9. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, curtailed, when public access is prohibited because of direct physical loss or damage to the property, or by a civil authority order that restricts or prohibits access to the property. This coverage, generally known as "business interruption coverage," is standard in most all-risk commercial property insurance policies.

10. Defendant, and most insurers that underwrote all-risk commercial property insurance policies with business interruption coverage, are denying their obligation to pay for business income losses and other covered expenses incurred by policyholders for the physical loss and damage to the insured property from measures

put in place by the civil authorities to stop the spread of COVID-19 among the population.

11. Plaintiff through this action seeks a declaratory judgment that affirms that the orders issued by civil authorities to stop the spread of the COVID-19 outbreak triggers coverage, has caused physical property loss and damage to the insured property, provides coverage for future civil authority orders that result in future suspensions or curtailments of business operations, and finds that Defendants are liable for the losses suffered by policyholders.

12. In addition, this action brings a claim against Defendant for its breach of its contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiff and others similarly situated for business losses and extra expenses, and related losses resulting from actions taken by civil authorities to stop the human-to-human and surface to human spread of the COVID-19 outbreak.

13. Plaintiff brings this action on behalf of a proposed class of policyholders who paid premiums in exchange for an all-risk commercial property insurance policy that included lost business income and extra expense coverage.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (a) Plaintiff and Defendant are citizens of different states (b) this is a class

4

action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs and (c) and no relevant exceptions apply to this claim.

15.    Venue is proper in this District pursuant to 28 U.S.C. §1391 in that Plaintiff is located in this and Defendant does business in this District and thus resides in this District, in accordance with 28 U.S.C. §1391.

## PARTIES

16.    Biltrite is a Wisconsin corporation, with its place of business located in Milwaukee County, Wisconsin. Since 1928, Biltrite has operated a retail furniture and mattress store in Milwaukee County, whose success depends on patrons being able to shop in its facility.

17.    Liberty Mutual is one of the world's largest property and casualty insurers with its principal place of business located at 175 Berkley Street, Boston, Massachusetts. Liberty Mutual through its subsidiaries, directly and indirectly, issue, among other things, property insurance.

18.    Liberty Mutual Liberty Mutual issued to Plaintiff Policy No BKS (20) 56 96 21 15 for the policy period between November 1, 2019 through November 1, 2020 (the "Policy").

19.    Plaintiff has continually and without interruption paid the policy premiums to Liberty Mutual specifically to provide coverages for coverage of lost

business income and extra expenses in the event of an involuntary business interruption.

## FACTUAL BACKGROUND

### A. <u>Defendant's Standard, Uniform All-Risk Commercial Property Insurance Policies</u>

20.     Liberty Mutual's insurance policies issued to Plaintiff and the Class Members are "all risk" commercial property policies that cover loss or damage to the covered premises resulting from all risks other than those expressly excluded.

21.     Plaintiff and Class Members do not participate in the drafting or negotiating of their policies with Liberty Mutual.

22.     The Policy, as well as the policies of other Class Members (the "Policies"), include standard forms used by Liberty Mutual for all insureds having applicable coverage.

### B. <u>Plaintiff's Factual Allegations</u>

23.     Among the coverages provided by the Policy was business interruption insurance, which, generally, would indemnify Plaintiff for lost income and profits if its business were shut down.

24.     The Business Income (And Extra Expense) Coverage Form, Commercial Property form CP 00 30 10 12 in the Policy provided coverage for Plaintiff as follows:

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 100 feet of such premises.

25.     In the same form, the Policy provided the following additional coverage

for Plaintiff:

5.     Additional Coverages

a.     Civil Authority

In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations. When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

(1)     Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

(2)     The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

Civil Authority Coverage for Business Income will begin 72 hours after the time of the first action of civil authority that prohibits access to the described premises and will apply for a period of up to four consecutive weeks from the date on which such coverage began.

7

Civil Authority Coverage for Extra Expense will begin immediately after the time of the first action of civil authority that prohibits access to the described premises and will end:

(1)        Four consecutive weeks after the date of that action; or

When your Civil Authority Coverage for Business Income ends; whichever is later

26.    The Business Income (And Extra Expense) Coverage Form defines

Business Income as:

a.    Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

b.    Continuing normal operating expenses incurred, including payroll.

27.    The Business Income (And Extra Expense) Coverage Form defines

Extra Expense as:

necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss. We will pay Extra Expense (other than the expense to repair or replace property) to:

(1)    Avoid or minimize the "suspension" of business and to continue operations at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement location or temporary location.

(2)    Minimize the "suspension" of business if you cannot continue "operations". We will also pay Extra Expense to repair or replace property, but only to the extent it reduces the amount

8

of loss that otherwise would have been payable under this Coverage Form.

28.    Plaintiff and all similarly situated Class Members have suffered a direct physical loss of and damage to their property because they have been unable to use their property for its intended purpose.

29.    On or about April 5, 2020, Plaintiff was advised that its claim with Liberty Mutual for business interruption insurance was denied because Plaintiff had not suffered direct physical loss or damage for purposes of that coverage and that no surrounding property had suffered direct physical loss or damage or for purposes of the Civil Authority coverage.

30.    Liberty Mutual's denial was wrongful because Biltrite had suffered direct physical loss or damage within the definition of the Policy.

31.    As drafter of the Policy, if Liberty Mutual had wished to exclude from coverage as "physical loss or damage" loss of use of property that has not been physically altered, it could have used explicit language stating such a definition of "physical loss or damage". It did not do so.

32.    Any Virus and Bacteria endorsement does not apply because Plaintiff's and other Class Members' losses were not caused by a "virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease". Rather, the efficient proximate cause of Plaintiff's, and other Class

9

Members' losses, were precautionary measures taken by the State of Wisconsin and other governmental authorities to prevent the spread of COVID-19 in the future, not because coronavirus was found in or on Plaintiff's insured property.

**C.    The COVID-19 Pandemic has Affected Liberty Mutual's Policyholders Nationwide**

33.    COVID-19 has and will continue to impact private commercial property in Wisconsin and throughout the United States, threatening the survival of thousands of retail establishments, and other businesses that have had their business operations suspended or curtailed indefinitely by order of civil authorities.

34.    Over 40 states and numerous local governments have enacted "stay-at-home" orders, and at least thirty-five states have closed all non-essential businesses with other states and local government having issued orders curtailing business operations, like those of the Plaintiff and other Class Members.

35.    No insurer intends to cover any losses caused by the COVID-19 pandemic.

36.    In addition, many state departments of insurance have issued advisories to business owners, to discourage business owners from filing claims, that COVID-19 is not an insured peril and there will be no coverage for business interruption.

37.    The insurance industry has actively advising state Insurance Commissioners that they do not intend to provide coverage for business interruption related to COVID-19.

10

38.    As a result, many businesses that maintain commercial multi-peril insurance policies with business interruption coverage, like Plaintiff and Class Members, will have significant uninsured losses because the insurance industry is stating that such policies do not cover COVID-19.

39.    The State of Connecticut Insurance Department, Maryland Insurance Administration, and the West Virginia Office of the Insurance Commissioner issued nearly identical notices supporting the insurance companies' reasons for denying business interruption claims, stating that the potential loss costs from such perils [like COVID-19] are so extreme that providing coverage would jeopardize the financial solvency of property insurers.[3]

40.    John F. King, Insurance and Safety Fire Commission for the State of Georgia issued Bulletin 20-EX-3 stating that losses from COVID-19 are excluded losses.[4]

41.    Vicki Schmidt, Kansas Insurance Department Commission issued a similar Bulletin stating it was her "understanding it is unlikely that a business policy would cover losses related to COVID-19."[5]

---

[3]  *See* https://portal.ct.gov/CID/Coronavirus/Business-Interruption-Insurance-Notice; https://insurance.maryland.gov/Pages/newscenter/NewsDetails.aspx?NR=2020256; https://www.wvinsurance.gov/Portals/0/pdf/pressrelease/20-08%20Business%20Interruption%20Insurance.pdf?ver=2020-03-26-222830-620.

[4]  https://www.oci.ga.gov/ExternalResources/Announcements/Bulletin-3172020-1619.pdf.

[5]  https://insurance.ks.gov/documents/department/COVID19-FAQ.pdf.

42.    In the wake of the pronouncements set forth above, in other states proposed legislation has been introduced requiring every insurance policy insuring against loss or damage to property, which includes the loss of use and occupancy and business interruption, be construed to include, among other covered perils, coverage for business interruption because of global virus transmission or pandemic.[6]

## D.    The Wisconsin Closure Orders

43.    On March 12, 2020, Wisconsin Governor Tony Evers issued Executive Order 72[7], "Declaring a Health Emergency in Response to the COVID-19 Coronavirus." In the accompanying press release, Governor Evers reminded people of simple steps to avoid getting sick, including frequent hand washing, covering coughs and sneezes, and staying home when sick.

44.    On March 16, 2020, Governor Evers issued Emergency Order 4, effective at 12:01 am on March 17, 2020,[8] ordering "a statewide moratorium on mass gatherings of 50 people or more to mitigate the spread of COVID-19." Restaurants and bars were limited to "50 percent of seating capacity or 50 total people, whichever

---

[6]  *See* House Bill No. 858, State of Louisiana House of Representatives. Similar legislation has been introduced in Massachusetts (Senate Bill Senate Docket. 2888); Wisconsin Wisconsin (Assembly No. 3844); Sate of New York (Assembly 10226); and Ohio (House Bill No. 589).

[7] https://evers.wi.gov/Documents/EO/EO072-DeclaringHealthEmergencyCOVID-19.pdf

[8] https://evers.wi.gov/Documents/EO/DHSOrderMassGatheringsof50orMore.pdf

is less," and were required to maintain "distancing of 6 feet between tables, booths, bar stools, and ordering counters."

45.    On March 17, 2020, Governor Evers issued Emergency Order 5, effective at 5:00 pm on March 17, 2020[9], prohibiting gatherings of "10 or more people in a single room or single confined space at the same time." Restaurants were allowed to "remain open for take-out or delivery service only," and were required to "preserve social distancing of six feet between customers during pick up."

46.    On March 20, 2020, Governor Evers issued Emergency Order 8[10], "Updated Mass Gathering Ban," further detailing the limit on bars and restaurants to take-out and delivery (with no delivery of alcoholic beverages to retail customers unless they paid in person).

47.    On March 24, 2020, Governor Evers issued Emergency Order 12[11], a "Safer At Home Order." Governor Evers stated "Despite prior emergency orders banning mass gatherings, the rates of infection continue to drastically increase, necessitating additional measures to slow the rate of infection and save lives." All individuals present within the state were ordered, "to stay at home or their place of

---

[9] https://evers.wi.gov/Documents/COVID19/UPDATEDOrder10People.pdf

[10] https://evers.wi.gov/Documents/COVID19/EMO08-MassGathering10v.2.pdf

[11] https://evers.wi.gov/Documents/COVID19/EMO08-MassGathering10v.2.pdf

residence," with certain exceptions. Bars and restaurants remained limited to take-out and delivery (with no delivery of alcoholic beverages to retail customers).

## CLASS ACTION ALLEGATIONS

48. Plaintiff brings this lawsuit pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all other persons similarly situated.

49. The Nationwide Class is defined as:

> All entities who have entered into standard all-risk commercial property insurance policies with Liberty Mutual , where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

> The Wisconsin Sub-Class is defined as:

> All entities who have entered into standard all-risk commercial property insurance policies with Liberty Mutual to insure property in Wisconsin, where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020.

Excluded from each class are the Defendant, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

14

50.     Plaintiff reserves the right to modify, expand, or amend the definitions of the proposed classes following discovery and before the Court determines whether class certification is appropriate.

51.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would prove those elements in individual actions alleging the same claims.

**Numerosity**

52.     This action satisfies the requirements of Fed.R.Civ.P. 23(a)(1). The Class numbers at least in the hundreds and consists of geographically dispersed business entities who are insured for business interruption losses. Liberty Mutual sells many insurance policies in the State of Wisconsin and most, if not all, other states and therefore joinder of the Class Members is impracticable.

53.     The identity of Class Members is ascertainable, as the names and addresses of all Class Members can be identified in Liberty Mutual's or its agents' books and records.

54.     Plaintiff anticipates providing appropriate notice to the certified Class in compliance with Fed. R. Civ. P. 23(c)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Typicality**

55.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiff's claims are typical of the claims of each of the Class Members, as all Class Members were and are similarly affected and their claims arise from the same all-risk commercial property insurance policy provisions entered into with Liberty Mutual.

56.     Each Class Member's insurance policy contains the same form providing coverage for business income loss. None of the forms excludes coverage due to a governmental action intended to reduce the effect of the ongoing global pandemic.

**Adequacy of Representation**

57.     Plaintiff is committed to prosecuting the action and will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action litigation, including litigation relating to insurance policies.

58.     Plaintiff has no interests antagonistic to or in conflict with other members of the Class. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

16

59.     Plaintiff has no interests antagonistic to or in conflict with other members of the Class. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

**Commonality**

60.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact that are common to each of the classes.

61.     These common questions predominate over any questions affecting only individual Class Members.

62.     The questions of law and fact common to the Class include, but are not limited to:

a.     Whether there is an actual controversy between Plaintiff and Liberty Mutual as to the rights, duties, responsibilities and obligations of the parties under the business interruption coverage provisions in standard all- risk commercial property insurance policies;

b.     Whether measures to reduce the spread of the COVID-19 pandemic are excluded from Plaintiff's and the Class Members standard all-risk commercial property insurance policies;

c.     Whether the measures put in place by civil authorities to stop the spread of COVID-19 caused physical loss or damage to covered commercial property;

d.     Whether Liberty Mutual has repudiated and anticipatorily breached the all-risk commercial property insurance policies the issued with business interruption coverage by intending to deny claims for coverage; and

e.     Whether Plaintiff and the Class Members suffered damages as a result of the breach or anticipatory breach by Liberty Mutual.

**Superiority/Predominance**

63.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of the rights of the Class Members. The joinder of individual Class Members is impracticable because of the vast number of Class Members who have entered into the standard all-risk commercial property insurance policies with Defendants.

64.     Because a declaratory judgment as to the rights and obligations under the uniform all-risk commercial property insurance policies will apply to all Class Members, most or all Class Members would have no rational economic interest in individually controlling the prosecution of specific actions. The burden imposed on the judicial system by individual litigation, and to Liberty Mutual, by even a small fraction of the Class Members, would be enormous.

65.     In comparison to separate individual litigation, class action litigation presents far fewer management difficulties, far better conserves the resources of both the judiciary and the parties, and far more effectively protects the rights of each Class Member.

66.     The benefits to the legitimate interests of the parties, the Court, and the public resulting from class action litigation substantially outweigh the expenses, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized

18

litigation. Class adjudication is superior to other alternatives under Fed. R. Civ. P. 23(b)(3)(D). Class treatment will also avoid the substantial risk of inconsistent factual and legal determinations on the many issues in this lawsuit.

67.     Plaintiff knows of no obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action.

68.     Rule 23 provides the Court with the authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges.

69.     The Court, on a motion by Plaintiff, or on its own determination, may certify nationwide and statewide classes for claims sharing common legal questions; use the provisions of Rule 23(c)(4) to certify particular claims, issues, or common questions of law or of fact for class-wide adjudication; certify and adjudicate bellwether class claims; and use Rule 23(c)(5) to divide any Class into subclasses.

## COUNT I

**DECLARATORY JUDGMENT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the National Class and the Wisconsin Subclass)**

70.     Plaintiff repeats the allegations set forth in paragraphs 1 through 69.

71.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Wisconsin Subclass.

19

72. The Policies are contracts under which Liberty Mutual was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policies.

73. Plaintiff, and other Class Members, have complied with all applicable provisions of the Policies and/or those provisions have been waived by Liberty Mutual or Liberty Mutual is estopped from asserting them, and yet Liberty Mutual has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class Members are entitled.

74. Liberty Mutual has denied claims related to COVID-19 on a uniform and class-wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

75. An actual case or controversy exists regarding Plaintiff's and the other Class Members' rights and Liberty Mutual's obligations under the Policies to reimburse Plaintiff and Class Members for the full amount of Business Income losses incurred by Plaintiff and the other Class Members in connection with the suspension of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

76. Pursuant to 28 U.S.C. § 2201, Plaintiff and the other Class Members seek a declaratory judgment from this Court declaring the following:

i. Plaintiff's and the other Class Members' Business Income losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

ii. Liberty Mutual is obligated to pay Plaintiff and other Class Members for the full amount of the Business Income losses incurred and to be incurred in connection with the Closure Order during the period of restoration and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

## <u>COUNT II</u>

**BREACH OF CONTRACT – BUSINESS INCOME COVERAGE**
**(Claim Brought on Behalf of the National Class and the Wisconsin Subclass)**

77. Plaintiff repeats the allegations set forth in paragraphs 1 through 69.

78. Plaintiff brings this Count individually and on behalf of the other members of the National Class and the Wisconsin Subclass.

79. The Policies are contracts under which Liberty Mutual was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policies.

80. In the Business Income (And Extra Expense) Coverage Form, Liberty Mutual agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

81. In the Business Income (And Extra Expense) Coverage Form, Liberty Mutual agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration"

21

caused by direct physical loss or damage. "Business Income" under the policy means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred", as well as "[c]ontinuing normal operating expenses incurred, including payroll"

82.     The closure orders, referred to above (the "Closure Orders"), caused direct physical loss and damage to Plaintiff's and the other Class Members requiring suspension of operations. Losses caused by these orders thus triggered the Business Income provision of Plaintiff's and the other Class Members' Policies.

83.     Plaintiff and the other Class Members have complied with all applicable provisions of the Policies and/or those provisions have been waived by Liberty Mutual or Liberty Mutual is estopped from asserting them, and yet Liberty Mutual has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

84.     By denying coverage for any Business Income losses incurred by Plaintiff and other Class Members as a result of the orders, Liberty Mutual has breached its coverage obligations under the Policies.

85.     Because of Liberty Mutual' s breaches of the Policies, Plaintiff and the other Class Members have sustained substantial damages for which Liberty Mutual is liable, in an amount to be established at trial.

## COUNT III

### ANTICIPATORY BREACH OF CONTRACT— BUSINESS INCOME COVERAGE
### (Claims Brought on Behalf of the National Class and the Wisconsin Subclass)

86.    Plaintiff repeats the allegations set forth in paragraphs 1 through 69.

87.    Plaintiff brings this Count individually and on behalf of the other members of the National Class and Wisconsin Subclass.

88.    The Policies, are contracts under which Liberty Mutual was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policies.

89.    In the Business Income (And Extra Expense) Coverage Form, Liberty Mutual agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary suspension of its operations during the "period of restoration."

90.    In the Business Income (And Extra Expense) Coverage Form, Liberty Mutual agreed to pay for its insureds' actual loss of Business Income sustained due to the necessary "suspension of [their] operations" during the "period of restoration" caused by direct physical loss or damage. A "partial slowdown or complete cessation" of business activities at the Covered Property is a "suspension" under the policy, for which Liberty Mutual  agreed to pay for loss of Business Income during the "period of restoration" "that occurs within 24 consecutive months after the date of direct physical loss or damage."

23

91.     "Business Income" under the policy means the "Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred if no physical loss or damage had occurred", as well as "[c]ontinuing normal operating expenses incurred, including payroll"

92.     The Closure Orders caused direct physical loss and damage to Plaintiff's and the other Class Members' Covered Properties, requiring suspension of operations at the Covered Properties. Losses caused by the Closure Order thus triggered the Business Income provision of the Policies.

93.     Notwithstanding the foregoing, Liberty Mutual will pay business interruption claims only if the subject property is physically altered.

94.     As a result, Liberty Mutual has anticipatorily breached the Policies of Plaintiff and other Class Members who have suffered physical loss or damage to their property because the use of that property has been substantially impaired and, thus, would be entitled to coverage under their Policies under applicable law, but for Liberty Mutual's anticipatory breach of contract.

95.     Plaintiff and the other Class Members have complied with all applicable provisions of their policies and/or Liberty Mutual has waived those provisions or Liberty Mutual is estopped from asserting them, and yet Liberty Mutual has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

24

96.     Because of Liberty Mutual's breaches of the Policies, Plaintiff and the other Class Members have sustained substantial damages for which Liberty Mutual is liable, in an amount to be established at trial.

**COUNT IV**

**DECLARATORY JUDGMENT – CIVIL AUTHORITY COVERAGE**
**(Claim Brought on Behalf of the National Class and the Wisconsin Subclass)**

97.     Plaintiff repeats the allegations set forth in paragraphs 1 through 69.

98.     Plaintiff brings this Count individually and on behalf of the other members of the National Class and Wisconsin Subclass.

99.     The Policies are contracts under which Liberty Mutual was paid premiums in exchange for its promise to pay Plaintiff's and other Class Members' losses for claims covered by the Policies.

100.    Plaintiff, and Class Members, have complied with all applicable provisions of the Policies and/or Liberty Mutual has waived those provisos or Liberty Mutual is estopped from asserting them, and yet Liberty Mutual has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class Members are entitled.

101.    Liberty Mutual has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can

25

render declaratory judgment no matter whether members of the Class have filed a claim.

102.    An actual case or controversy exists regarding Liberty Mutual 's obligations under the Policies to reimburse Plaintiff and other Class Members for the full amount of covered Civil Authority losses incurred by Plaintiff and other Class Members in connection with Closure Orders and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

103.    Pursuant to 28 U.S.C. § 2201, Plaintiff and other Class Members seek a declaratory judgment from this Court declaring the following:

    i.    Plaintiff's and other Class Members' Civil Authority losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from the COVID-19 pandemic are insured losses under their Policies; and

    ii.    Liberty Mutual is obligated to pay Plaintiff and other Class Members the full amount of the Civil Authority losses incurred and to be incurred in connection with the covered losses related to the Closure Order and the necessary interruption of their businesses stemming from the Orders intended to mitigate the COVID-19 pandemic.

## COUNT V

### BREACH OF CONTRACT – CIVIL AUTHORITY COVERAGE
**(Claim Brought on Behalf of the National Class and the Wisconsin Subclass)**

104.    Plaintiff repeats the allegations set forth in paragraphs 1 through 69.

26

105.   Plaintiff brings this Count individually and on behalf of the other members of the National Class and Wisconsin Subclass.

106.   The Policies are contracts under which Liberty Mutual was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policies.

107.   Liberty Mutual Business Income (And Extra Expense) Coverage Form provides "Civil Authority" coverage, which promises to pay "the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

> 1.     Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> 2.     The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property."

108.   The Closure Orders triggered the Civil Authority provision under the Policies.

109.   Plaintiff and the other members of the Class have complied with all applicable provisions of the Policies and/or Liberty Mutual has waived those

provisions or Liberty Mutual is estopped from asserting them, and yet Liberty Mutual has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

110. By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Orders and Orders intended to mitigate the COVID-19 pandemic, Liberty Mutual has breached its coverage obligations under the Policies.

111. Because of Liberty Mutual's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Liberty Mutual is liable, in an amount to be established at trial.

## <u>COUNT VI</u>

### DECLARATORY JUDGMENT – EXTRA EXPENSE COVERAGE
**(Claim Brought on Behalf of the National Class and the Wisconsin Subclass)**

112. Plaintiff repeats the allegations set forth in paragraphs 1 through 69.

113. Plaintiff brings this Count individually and on behalf of the other members of the National Class and the Wisconsin Subclass.

114. The Policies are contracts under which Liberty Mutual was paid premiums in exchange for its promise to pay Plaintiff's and other Class Members' losses for claims covered by the Policies.

115. Plaintiff, and other Class Members have complied with all applicable provisions of the Policies and/or Liberty Mutual has waived those provisions or

28

Liberty Mutual is estopped from asserting them, and yet Liberty Mutual has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms and has wrongfully and illegally refused to provide coverage to which Plaintiff and Class Members are entitled.

116. Liberty Mutual has denied claims related to COVID-19 on a uniform and class wide basis, without individual bases or investigations, so the Court can render declaratory judgment no matter whether members of the Class have filed a claim.

117. An actual case or controversy exists regarding Liberty Mutual's obligations under the Policies to reimburse Plaintiff and the other Class Members for the full amount of Extra Expense losses incurred by Plaintiff and Class Members in connection with Closure Orders and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID- 19 pandemic.

118. Pursuant to 28 U.S.C. § 2201, Plaintiff and other Class Members seek a declaratory judgment from this Court declaring the following:

i. Plaintiff's and other Class Members' Extra Expense losses incurred in connection with the Closure Order and the necessary interruption of their businesses stemming from Orders intended to mitigate the COVID-19 pandemic are insured losses under their Policies; and

ii. Liberty Mutual is obligated to pay Plaintiff and other Class Members for the full amount of the Extra Expense losses incurred and to be incurred in connection with the covered losses related to the Closure Order during the period of restoration and the necessary interruption of

29

their businesses stemming from Orders intended to mitigate the COVID-19 pandemic.

## COUNT VII

**BREACH OF CONTRACT – EXTRA EXPENSE COVERAGE**
**(Claim Brought on Behalf of the National Class and the Wisconsin Subclass)**

119.   Plaintiff repeats the allegations set forth in paragraphs 1 through 69.

120.   Plaintiff brings this Count individually and on behalf of the other members of the National Class and Wisconsin Subclass.

121.   The Policies are contracts under which Liberty Mutual was paid premiums in exchange for its promise to pay Plaintiff's and the other Class Members' losses for claims covered by the Policies.

122.   In the Business Income (And Extra Expense) Coverage Form, Liberty Mutual also agreed to pay necessary Extra Expense that its insureds incur during the "period of restoration" that the insureds would not have incurred if there had been no direct physical loss or damage to the described premises. "Extra Expense" means expenses "to avoid or minimize the suspension of business and to continue 'operations,'" and to repair or replace property.

123.   Due to the Closure Orders, Plaintiff and other members of the Class incurred Extra Expense at Covered Property

124.   Plaintiff and other members of the Class have complied with all applicable provisions of the Policies and/or Liberty Mutual has waived those provisions or Liberty Mutual is estopped from asserting them, and yet Liberty

30

Mutual has abrogated its insurance coverage obligations pursuant to the Policies' clear and unambiguous terms.

125. By denying coverage for any business losses incurred by Plaintiff and other members of the Class in connection with the Closure Order and Orders intended to mitigate the COVID-19 pandemic, Liberty Mutual has breached its coverage obligations under the Policies.

126. Because of Liberty Mutual's breaches of the Policies, Plaintiff and the other members of the Class have sustained substantial damages for which Liberty Mutual is liable, in an amount to be established at trial.

## **JURY DEMAND**

127. Plaintiff hereby demands a trial by jury.

WHEREFORE, Plaintiff, on behalf of themselves and all similarly situated individuals, demand judgment against the Defendant as follows:

(1)  Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23(a) and Rule 23(b)(3) and declaring Plaintiff and its counsel to be representatives of the Class and Wisconsin Subclass;

(2)  Issuing a Declaratory Judgment declaring the parties' rights and obligations under the Policies;

(3)  Awarding Plaintiff and the Class compensatory damages from Liberty Mutual 's breach of the Policies in an amount to be determined at trial,

together with appropriate prejudgment interest at the maximum rate allowable by law;

(4) Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses; and

(5) Awarding such other and further relief the Court deems just, proper, and equitable.

Dated: Milwaukee, Wisconsin
      April 24, 2020

By: /s John D. Blythin

Guri Ademi (SBN 1021729)
Shpetim Ademi (SBN 1026973)
John D. Blythin (SBN 1046105)
Ademi & O'Reilly, LLP
3620 East Layton Avenue
Cudahy, Wisconsin 53110
(414) 482-8000

Robert S. Schachter
Dan Drachler
Ana Maria Cabassa-Torres
ZWERLING, SCHACHTER &
ZWERLING, LLP
41 Madison Avenue
New York, NY 10010
(212)223-3900

Case 2:20-cv-00656-WED   Filed 04/24/20   Page 32 of 33   Document 1

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Christopher A. Seeger
Stephen A. Weiss
SEEGER WEISS
55 Challenger Road, 6th Floor
Ridgefield Park, New Jersey 07660
(973) 639-9100

Samuel H. Rudman
ROBBINS GELLER RUDMAN
 & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Paul J. Geller
Stuart A. Davidson
ROBBINS GELLER RUDMAN
 & DOWD LLP
120 East Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
(561) 750-3000

Attorneys for Plaintiff and the Classes

33