# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BILTRITE FURNITURE, INC.,

                Plaintiff,

v.

OHIO SECURITY INSURANCE COMPANY,

                Defendant.

Case No. 20-CV-656-JPS

**ORDER**

On April 24, 2020, Biltrite Furniture, Inc., ("Plaintiff"), a furniture retailer, filed a class action complaint alleging breach of contract and anticipatory breach of contract, and seeking declaratory judgment against insurer Ohio Security Insurance Company ("Defendant").[1] Plaintiff alleges that Defendant failed to carry out its "contractual obligation under common all-risk commercial property insurance policies to indemnify Plaintiff" for lost business income arising from the COVID-19 pandemic. (Docket #1). Specifically, Plaintiff brings claims for coverage under three provisions of

---

[1] Plaintiff purchased its insurance policy from Ohio Security Insurance Company, an affiliate of Liberty Mutual, but originally named Liberty Mutual in the complaint. *See* (Docket #21 at 8). Liberty Mutual contends that Plaintiff has "no claim against [it] as there is no contract between these parties." (Docket #18 at 8). However, Liberty Mutual has proceeded to answer and rigorously defend the lawsuit, *see generally id.*; (Docket #14, #23), and Plaintiff requested leave to amend the complaint to name Ohio Security Insurance Company as the defendant. (Docket #21 at 9 n.4). Liberty Mutual did not contest this. The Court will construe this as an instance of correcting a misnomer and will grant the amendment. Fed. R. Civ. P. 15(c)(1)(C); *Eison v. McCoy*, 146 F.3d 468, 471 (7th Cir. 1998) (noting that a "misnomer situation [i]s one in which the 'proper defendant is already before the court and the effect [of the amendment] is merely to correct the name under which he is sued.'") (quoting *Wood v. Worachek*, 618 F.2d 1225, 1229 (7th Cir. 1998)).

the insurance policy: (1) the Business Income coverage provision; (2) the Extra Expenses coverage provision; and (3) the Civil Authority coverage provision. On September 9, 2020, Defendant filed an answer to the complaint. (Docket #14).[2] On November 16, 2020, Defendant filed a motion for judgment on the pleadings. (Docket #17). That motion is now fully briefed. For the reasons explained below, the motion will be granted, and the case will be dismissed.

1. **LEGAL STANDARD**

Federal Rule of Civil Procedure Rule 12(c) "permits a party to move for judgment after the complaint and answer have been filed by the parties." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). A motion for judgment on the pleadings "is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Adams v. City of Indianapolis*, 742 F.3d 720, 727–28 (7th Cir. 2014). To survive a challenge under Rule 12(c) or 12(b)(6), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In other words, the complaint must give "fair notice of what the. . .claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must "plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level[.]" *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016) (citation omitted). In reviewing the complaint, the Court is required to "accept as true all of the well-pleaded facts in the

---

[2]The case was initially stayed pending a decision by the Judicial Panel on Multidistrict Litigation ("JPML") regarding consolidation and transfer. (Docket #11, #12). However, the JPML declined to centralize the action with other COVID-19 related insurance disputes. (Docket #13).

complaint and draw all reasonable inferences in favor of the plaintiff." *Id.* at 480–81.

## 2. RELEVANT ALLEGATIONS

### 2.1 Factual Background[3]

In December 2019, a highly infectious and potentially deadly virus, later identified as SARS-CoV-2 ("COVID-19") began circulating the globe. By March 2020, COVID-19 was declared a global pandemic. In major metropolitan areas, intensive care units ran over-capacity, and doctors had to turn away sick patients. To curb the number of infections—and to ensure adequate resources for those who did become sick—governments restricted travel, gathering, and general daily activities.

In Wisconsin, these restrictions took the form of a series of Emergency Orders, which attempted to respond to the rapidly changing public health crisis. On March 24, 2020, Governor Tony Evers issued a "Safer at Home Order," which required individuals to "stay at home or their place of residence" with certain exceptions, none of which were applicable to Plaintiff, a furniture retailer. (Docket #20-5 at 3). Accordingly, Plaintiff shut down its store for an indeterminate amount of time in order to comply with the rule.

Shortly after shutting down, Plaintiff filed a business interruption claim under its all-risk insurance policy for lost profits. On April 5, 2020, Defendant informed Plaintiff that its claim had been denied because

---

[3]Without converting this motion into one for summary judgment, the Court will consider the insurance contract at issue and the relevant Emergency Orders. These documents are appropriate for consideration at this stage because they are incorporated by reference in the complaint, central to Plaintiff's claims, and "concededly authentic." *Hecker v. Deere & Co.*, 556 F.3d 575, 582–3 (7th Cir. 2009).

(1) Plaintiff "had not suffered direct physical loss or damage for purposes of" its Business Income and Extra Expense coverage, and (2) "no surrounding property had suffered direct physical loss or damage. . .for purposes of the Civil Authority coverage." (Docket #1 ¶ 29). Plaintiff's claim was also purportedly excluded because it fell under the "Virus and Bacteria" exclusion, which precludes coverage for closures resulting from a contagious bacteria and virus. (*Id.* ¶ 32).

Plaintiff disputes the denial of the claim, and filed suit on behalf of itself and other policyholders who were denied coverage for losses incurred due to closures required by the COVID-19 pandemic. Specifically, Plaintiff is suing on behalf of a nationwide class and Wisconsin sub-class of those who have "entered into standard all-risk commercial property insurance policies with Liberty Mutual . . .where such policies provide for business income loss and extra expense coverage and do not exclude coverage for pandemics and who have suffered losses due to measures put in place by civil authorities' stay-at-home or shelter-in-place orders since March 15, 2020[.]" (*Id.* ¶ 49).

**2.2  Insurance Policy Provisions**

Plaintiff's insurance policy provides, in relevant part:

A.   Coverage

1.   Business Income

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

> …
>
> 2. Extra Expense
>
> a. Extra Expense Coverage is provided at the premises described in the Declarations only if the declarations show that Business Income Coverage applies at that premises.
>
> b. Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.
>
> …
>
> 5. Additional Coverage
>
> a. Civil Authority
>
> In this Additional Coverage, Civil Authority, the described premises are premises to which this Coverage Form applies, as shown in the Declarations. When a Covered Cause of Loss Causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:
>
> 1. Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> 2. The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

(Docket #19-3 at 145–46). A "Covered Cause of Loss" means "direct physical loss," subject to certain exclusions. (*Id.* at 169). The policy does not cover losses or damages "caused by or resulting from . . . [d]elay, loss of use

or loss of market." (*Id.* at 171). Additionally, the contract specifically disclaims liability for losses arising from viruses:

> **COMMERCIAL PROPERTY COVERAGE PART STANDARD PROPERTY POLICY**
>
> A. The exclusion set forth in Paragraph B. applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.
>
> B. We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease. However, this exclusion does not apply to loss or damage caused by or resulting from "fungus," wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

(*Id.* at 160).

### 3. ANALYSIS

Defendant moves for judgment on the pleadings based on several grounds. First, there was no "direct physical loss of or damage to covered property" sufficient to trigger the policy. Second, and relatedly, mere loss of use of the premises does not fall within the Business Income and Extra Expense provisions. Third, the Civil Authority coverage provision does not apply to the Emergency Orders. Finally, Defendant contends that Plaintiff's claims are barred by the policy's virus exclusion.

The parties agree that Wisconsin law applies. (Docket #21 at 10 n.5). Under Wisconsin law, "[i]nsurance policies are construed as they would be understood by a reasonable person in the position of the insured." *Am.*

*Family Mut. Ins. Co. v. Am. Girl, Inc.*, 673 N.W.2d 65, 73 (Wis. 2004). Courts will first "examine the facts of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage." (*Id.*) If the policy covers the claim, courts "next examine the various exclusions to see whether any of them preclude coverage[.]" (*Id.*) If the exclusion is "uncertain," it will be "narrowly or strictly construed against the insurer." (*Id.*)

### 3.1 Policy Coverage – Business Income and Extra Expenses

Plaintiff does not have coverage under either the Business Income or Extra Expenses provision. Each provision makes an initial grant of coverage to lost business income or extra expenses where there is "direct physical loss . . .or damage to property." (Docket #19-3 at 145). Here, Plaintiff alleges that the "direct physical loss of and damage to property" is the inability to "use th[e] property for its intended purpose." (Docket #1 ¶ 28). Plaintiff argues that "loss" must be constructed to encompass "loss of use" in order to avoid surplusage. Otherwise, "direct physical loss" would elide with "damage to" property, rendering the latter meaningless.

This falls short of reason. These terms are undefined, therefore the Court must apply "their common and ordinary meaning," as they would be understood by a reasonable insured party. *Leicht Transf. & Storage Co. v. Pallet Cent. Enter., Inc.*, 928 N.W.2d 534, 538 (Wis. 2019). "Direct physical loss . . .unambiguously requires some form of actual, physical damage to the insured premises to trigger coverage." *Green Beginnings, LLC v. West Bend Ins. Co.*, Case No. 20-CV-1661, 2021 WL 2210116, at *4 (E.D. Wis. May 28, 2021) (applying Illinois law to an insurance dispute bearing the same language as the policy at issue in this case) (quoting *Sandy Point Dental, PC v. Cincinnati Ins. Co.*, 488 F. Supp. 3d 690, 693 (N.D. Ill. 2020)). As many

courts have noted, "direct physical loss" encompasses theft, misplacement, or total destruction of property, while "damage" addresses specifically harmed components, or other "lesser" injuries. *Michael Cetta, Inc. v. Admiral Indem. Co.*, Case No. 20 Civ. 4612, 2020 WL 7321405, at *18–19 (S.D.N.Y. Dec. 11, 2020) (calling plaintiff's argument requiring "direct physical loss" to include "loss of use" an "untenable leap in logic.").

Plaintiff's own proposed definition of "loss" supports this reading: it observes that "the dictionary defines 'loss' as 'destruction, ruin' **or** 'the act of losing possession.'" (Docket #21 at 12). Indeed, "[g]iving separate effect to 'loss' and 'damage' in the phrase, 'direct physical loss of or damage to' only highlights the distinction between 'the permanent dispossession of' and 'damage'." *Real Hosp., LLC v. Travelers Cas. Ins. Co. of Am.*, 499 F. Supp. 3d 288, 294 (S.D. Miss. 2020). It is not superfluous for "loss" to mean exactly what it says. The Court is not persuaded of the term's ambiguity or surplusage merely because one single, outlier district court has come to another conclusion. *See e.g.*, *Studio 417, Inc. v. Cincinnati Ins. Co.*, 478 F. Supp. 3d 794, 803 (W.D. Mo. 2020) (finding a direct physical loss to a restaurant where plaintiff alleged that COVID-19 is "a physical substance" that lives on physical surfaces, making plaintiff's property "unsafe and unusable."). Plaintiff has not alleged that it was deprived of its premises, nor that its covered property was destroyed or damaged.[4] Therefore, coverage under the Business Income and Extra Expenses provisions is inapplicable.

---

[4]The cases that Plaintiff cites in support of the notion that physical losses do not require physical alteration are readily distinguishable—each case that Plaintiff cites deals with a physical peril that made entering a structure hazardous. *See Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1, 5 (W. Va. 1998) (holding that a yet-undamaged home situated underneath a negligently constructed vertical highwall that suffered ongoing rockfalls may be covered by home insurance

Plaintiff's contention that "loss of use and functionality" should be covered by the policy falls short for another reason: as stated above, the insurance policy at issue does not cover losses or damages *"caused by or resulting from . . . [d]elay, loss of use or loss of market."* (Docket #19-3 at 171) (emphasis added). As Plaintiff would have it, the *cause* of the loss is the Emergency Order; the *result* is the loss of use. (Docket #1 ¶ 11) (explaining that "Covered Cause[s] of Loss" are "the orders issued by civil authorities to stop the spread of the Covid-19 outbreak[.]"); (*id.* ¶ 32) ("the efficient proximate cause of . . .losses[] were [sic] precautionary measures taken by the State of Wisconsin and other governmental authorities to prevent the spread of COVID-19 in the future"). However, under these circumstances, the lost business income and extra expenses still *result from* the loss of use—rather than any physical loss or damage. Since the insurance policy explicitly does not cover business income losses *resulting from* loss of use, Plaintiff's proposed construction—which purportedly avoids surplusage—would render the policy's "loss of use" exception superfluous. (Docket #19-3 at 171). Indeed, the existence of a "separate provision for loss of use

---

policies because losses "may exist in the absence of structural damage"); *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am.*, Case No. 2:12-cv-4418, 2014 WL 6675934, at *5–6 (D.N.J. Nov. 25, 2014) (finding a direct physical loss when a juice packaging facility was contaminated with ammonia); *W. Fire Ins. Co. v. First Presbyterian Church*, 437 P.2d 52, 55 (Colo. 1968) (noting that loss of use "standing alone, does not in and of itself constitute a 'direct physical loss,'" but holding that the "accumulation of gasoline around and under the church building" such that it became "so infiltrated and saturated as to be uninhabitable" was a direct physical loss); *Or. Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, 2016 WL 3267247, at *4–5 (D. Or. June 7, 2016) (finding physical loss or damage where wildfire smoke infiltrated a theater) (vacated on parties' joint stipulation). Here, by contrast, there was nothing toxic or inherently dangerous about the premises. Rather, the concern was that many people in close proximity to one another—regardless of where—would quicken the transmission of COVID-19.

Page 9 of 15
Case 2:20-cv-00656-JPS   Filed 07/20/21   Page 9 of 15   Document 25

suggests that the 'direct physical loss of . . . property' clause was *not* intended to encompass a loss where the property was rendered unusable without an intervening physical force." *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 487 F. Supp. 3d 834, 842 (N.D. Cal. 2020) (emphasis added).

Finally, Plaintiff's argument that its loss of use and functionality are "physical losses" within the policy's grant of coverage is unsupported by Wisconsin law. *See Wis. Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 607 N.W.2d 276, 284 (Wis. 2000). In *Wisconsin Label*, the court found no physical damage to items that were accidentally mislabeled and resulted in lost costs to a store. *Id.* Rather, because the items were "undamaged" and "saleable," the pricing issue could be fixed with another label. *Id.* Similarly, there is no physical damage to the store or items therein by virtue of the COVID-19 pandemic or the attendant closure orders—the store is still inhabitable, and the products still saleable. As another court aptly noted, if loss of use is a "direct physical loss," then any "government order barring access to a property would itself trigger business income or extra expense coverage[.]" *Moody v. Hartford Fin. Grp., Inc.*, Case No. 20-2856, 2021 WL 135897, at *6 (E.D. Pa. Jan. 14, 2021). This would render the Civil Authority provision, which grants "coverage when civil authority orders bar access to premises under more limited circumstances[,]" useless. (*Id.*)

This Court thus follows the many courts that have held that "a complaint which only alleges loss of use of the insured property fails to satisfy the requirement for physical damage or loss." *Food for Thought Caterers Corp. v. Sentinel Ins. Co., Ltd.*, Case No. 20-cv-3418, 2021 WL 860345, at *4 (S.D.N.Y. Mar. 6, 2021) (citing cases). The insurance policy at issue clearly does not cover business income losses and extra expenses resulting from Plaintiff's mere inability to use the premises.

### 3.2 Policy Coverage – Civil Authority

In order for Civil Authority Coverage to apply, three criteria must exist: (1) damaged off-premises property within one mile of the premises, which resulted from a covered cause of loss; (2) a civil authority order barring access to the area surrounding the damaged property; and (3) *either* the civil authority order was taken in response to dangerous physical conditions *caused by* damage or the covered cause of loss, *or* the civil authority required "unimpeded access to the damaged property." (Docket #19-3 at 146). Not one of these criteria exist in the current situation.

First, there is no damaged off-premises property alleged in the complaint (nor are the premises themselves alleged to be damaged; *see* Section 3.1, above). Second, the civil authority order does not bar access to an area surrounding a property—rather, the Emergency Orders generally require people to stay at home to stop the spread of a virus, with certain exceptions. Third, neither the "damage" (which, recall, is loss of use and functionality) nor the "covered cause of loss" (which Plaintiff frames as the civil authority order) *caused* a dangerous condition—in fact, both likely *prevented* a dangerous condition. Finally, no civil authority required "unimpeded access to [a] damaged property," if any were to have been alleged.

The parties seem to agree that civil authority orders "intended to prevent future harm, rather than existing property loss or damage," do not fall within Civil Authority Coverage provisions. (Docket #21 at 28–29); *see United Airlines, Inc. v. Ins. Co. of the State of Penn.*, 439 F.3d 128, 134–35 (2d Cir. 2006) (no business interruption coverage under terrorism provisions where closures were due to government orders heightening safety standards, rather than a crash at the Pentagon); *Syufy Enters. v. Home Ins.*

*Co. of Ind.*, Case No. 94—0756-FMS, 1995 WL 129229, at *2 (N.D. Cal. Mar. 21, 1995) (no civil authority coverage for a theater when a dawn-to-dusk curfew was imposed because "theater access was not specifically foreclosed."). However, Plaintiff argues that "[t]hose cases are distinguishable because the civil authority orders in those cases were intended to prevent future harm, rather than existing property loss or damage . . . Here, the [Emergency] Orders have already caused Plaintiff to suffer a 'physical loss of' property." (Docket #21 at 28–29).[5] This does not make sense. Here, too, the Emergency Orders were intended to prevent future harm—i.e., the increased rate of transmission of COVID-19, which, absent the Orders, was certain.

### 3.3 Exemptions – Virus Exclusion Provision

In many ways, the sections above are an academic exercise, because regardless of whether there was a "direct physical loss or damage" either on the property or near the property, when the issue boils down to its essence, the losses resulting from the COVID-19 pandemic are not a covered *cause* of loss. The policy explicitly says that it "will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." (Docket #19-3 at 160). Here, Plaintiff alleges that its losses resulted from the Emergency Orders. These Emergency Orders resulted from COVID-19, a virus. Thus, Plaintiff's losses resulted from COVID-19, a

---

[5] On that same page, Plaintiff recognizes that the Emergency Orders were issued "during a pandemic based on a virus that damaged Plaintiff's property." (Docket #21 at 28). This theory of relief is unavailable based on the Virus Exclusion provision, discussed in Section 3.3. It also reveals a crack in Plaintiff's tortured attempt to find policy coverage: at the end of the day, the losses were caused by a virus.

virus. Accordingly, these losses are excluded from coverage. *Green Beginnings, LLC*, 2021 WL 2210116 at *7 (holding that "[t]he language of the virus exclusion provision . . .clearly and unambiguously preclude[s] coverage" where "a virus resulted in the . . .Orders being issued, damage caused by the orders was caused by the virus"). The fact that Plaintiff's property was not contaminated is not relevant—the policy does not require contamination.

Plaintiff argues that there is a "distinction between losses caused by precautionary measures taken to avoid an excluded peril, which trigger coverage, and losses caused by the excluded peril itself, which do not." (Docket #21 at 31). In this case, that is a distinction without a difference— one that Plaintiff has clumsily acknowledged in its own briefing. (*Id.* at 28) (explaining that the Emergency Orders were issued "during a pandemic based on a virus that damaged Plaintiff's property."). Additionally, the Emergency Orders, as their name suggests, were hardly "precautionary." When the Emergency Orders took effect, the known number of COVID-19 cases had increased 102% in three days; five people were confirmed to have passed away from the virus. (Docket #20-5 at 1). The virus's rapid spread was a calculated inevitability—the Emergency Orders were implemented to "reduce further spread" in the future, not to reduce the *risk* of further spread. *C.f. Newman Myers*, 17 F. Supp. 3d 323, 333–34 (S.D.N.Y. 2014) (finding that an insurer had not met its burden of showing that a flood exclusion applied when evidence showed that an electric grid shut down in anticipation of flooding, rather than as the result of a flood); *United Airlines*, 439 F.3d at 134–35 (denying business interruption coverage to airline where losses were the result of government orders to curb potential terrorism, rather than terrorism itself). Additionally, though Plaintiff cites *Newman*

*Myers* and *United Airlines* in support of their argument that the losses caused by the "precautionary measure" are distinct from losses caused by the peril itself, these cases are not squarely on point—in both, coverage was denied due to a lack of physical loss or damages, and the inapplicability of any other provision. *Newman Myers*, 17 F. Supp. 3d at 331; *United Airlines*, 439 F.3d at 131–34. In short, Plaintiff cannot overcome the virus exclusion provision, which plainly denies coverage for damages or losses resulting from viruses.

### 4. CONCLUSION

The COVID-19 pandemic was a tragedy with many unfortunate consequences, which include business losses. Though some insurance policies may cover those losses, not all will. When a policy, read plainly, does not cover the loss or the cause of loss, the Court simply cannot rewrite the policy to provide coverage where none was due. *Wis. Label Corp.*, 607 N.W.2d at 283. Better recourse for these losses might be found through Congress.

Accordingly,

**IT IS ORDERED** that Plaintiff's request to name Ohio Security Insurance Company as Defendant be and the same is hereby **GRANTED**, and Ohio Security Insurance Company will be deemed a party to these proceedings;

**IT IS FURTHER ORDERED** that Defendant's motion for judgment on the pleadings (Docket #17) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 20th day of July, 2021.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge